RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

FORESIGHT COAL SALES, LLC.,

　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

KENT CHANDLER, in his official capacity as Chairman and Commissioner of Kentucky Public Service Commission, et al.,

　　　　　　　　　*Defendants-Appellees*.

No. 21-6069

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:21-cv-00016—Gregory F. Van Tatenhove, District Judge.

Argued: June 7, 2022

Decided and Filed: February 3, 2023

Before: BATCHELDER, CLAY, and LARSEN, Circuit Judges.
───────────────

## COUNSEL

**ARGUED:** Joshua I. Hammack, BAILEY & GLASSER, LLP, Washington, D.C., for Appellant. Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Joshua I. Hammack, Nicholas S. Johnson, BAILEY & GLASSER, LLP, Washington, D.C., Christopher D. Smith, BAILEY & GLASSER, LLP, Charleston, West Virginia, for Appellant. Matthew F. Kuhn, Brett R. Nolan, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

　　LARSEN, J., delivered the opinion of the court in which CLAY, J., joined in full. BATCHELDER, J. (pg. 19), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.  Kentucky imposes a severance tax on coal extracted within its borders.  At the same time, Kentucky directs its utilities to buy the most competitive coal, with cost being one of the most important factors.  Predictably, this combination of measures, along with the fact that many coal-producing states don't impose a severance tax, makes Kentucky utilities less likely to buy Kentucky coal.  Recognizing the problem, the Kentucky legislature decided to have its cake and eat it, too.  The legislature directed the agency that regulates Kentucky utilities to evaluate the reasonableness of coal prices after subtracting any severance tax paid from the actual bid price.  In practice, the policy makes coal from states with severance taxes, like Kentucky, cheaper for the utilities by the amount of the severance tax.

A coal producer from Illinois, where there is no severance tax, challenged the policy as a violation of the Commerce Clause.  The Commission responded that it wasn't discriminating against interstate commerce because it was only leveling the playing field tilted against Kentucky coal by its own severance tax.  Twice the district court bought this argument.  We do not.

I.

The Public Service Commission, a state agency, regulates utilities in Kentucky. The Commission is tasked with ensuring that energy rates remain "reasonable" for consumers. Ky. Rev. Stat. Ann. § 278.030; *see id.* § 278.040.  One of the Commission's regulations, the fuel adjustment clause, allows utilities to adjust the base rates they charge customers to account for fluctuating fuel costs.  *See* 807 Ky. Admin. Regs. § 5:056(1)(1).  If the rate charged to customers is unreasonable, the charges are disallowed, the utility eats the cost, and the utility may be suspended from using the fuel adjustment clause.  *Id.* § 5:056(3)(1).  To determine what charges are reasonable, the Commission conducts six-month and two-year reviews of each utility.  *Id.* § 5:056(3)(3)–(4).  And one of the most substantial factors during review is the price the utility

paid for raw materials, like coal. Basically, Kentucky utilities are encouraged to buy cheaper coal.

This setup is a problem for Kentucky coal producers, who must pay a severance tax equal to 4.5% of the gross value of the coal upon extraction. Ky. Rev. Stat. Ann. § 143.020. Compared to states with no severance tax, Kentucky coal is relatively expensive. So, because of the fuel adjustment clause and its reasonableness requirement, Kentucky utilities are discouraged, on the margin, from buying Kentucky coal.

Kentucky has tried several times to solve this problem. In 2019, the Kentucky House of Representatives adopted House Resolution 144, which encouraged the Commission "to amend its administrative regulations to consider all costs, including fossil fuel-related economic impacts within Kentucky, when analyzing coal purchases under the fuel adjustment clause." H.R. 144, 2019 Reg. Sess. (Ky. 2019). Weeks later, the Commission issued a draft regulation stating that, in determining the reasonableness of fuel costs, the Commission would consider the cost of the fuel less the Kentucky severance tax. Simply put, the Commission would artificially discount the price of Kentucky coal by 4.5%. However, the Commission never adopted the drafted language out of concern that the regulation might violate the dormant Commerce Clause. Instead, the final regulation stated that the Commission would artificially discount a utility's fuel costs by the amount of the severance tax paid to any jurisdiction.

In late 2019, Foresight Coal Sales, LLC, an Illinois coal producer, sent a letter to the Commission arguing that the amended regulation was still unconstitutional under the Commerce Clause. In response, the Commission briefly suspended enforcement. But the Kentucky Attorney General issued an opinion saying that the regulation was legal because, while it might benefit Kentucky coal relative to producers in some states, it might hurt Kentucky coal relative to others. So the Commission resumed its enforcement.

Foresight Coal sued in the Eastern District of Kentucky and sought a preliminary injunction. The district court denied the motion, and Foresight Coal appealed to this court. The parties fully briefed the appeal, and oral argument was scheduled for December 4, 2020. Then,

right before argument, the Commission agreed to rescind the regulation, and Foresight Coal dropped the case.

Kentucky wasn't done, though.  On March 25, 2021, the Kentucky Governor signed Senate Bill 257 into law.  The new law requires the Commission to "evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less any coal severance tax imposed by any jurisdiction."  Ky. Rev. Stat. Ann. § 278.277(1).  In form and function, the new law is the same as the old regulation.  The new law went into effect on July 1, 2021.

Foresight Coal again sued the Commission members in their official capacities and, again, sought a preliminary injunction.  With "a distinct sense of déjà vu," the district court again denied the preliminary injunction.  *Foresight Coal Sales, LLC v. Chandler*, No. 3:21-cv-00016-GFVT, 2021 WL 5139491, at *1 (E.D. Ky. Nov. 3, 2021).  Foresight Coal appeals.

## II.

A court must balance four factors when considering a preliminary injunction:  "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365–66 (6th Cir. 2022) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)).  We review the district court's ultimate determination of whether these factors favor an injunction for an abuse of discretion.  *Id.* at 366.  But the likelihood of success on the merits is often the determinative factor.  *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 735 (6th Cir. 2021) (per curiam).  And that factor we review de novo.  *Union Home Mortg. Corp.*, 31 F.4th at 366.

Congress has the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  "[T]he Commerce Clause is written as an affirmative grant of authority to Congress."  *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018).  And some have argued that, under the plain text of the Constitution, its reach ends there.  *E.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 610 (1997) (Thomas, J.,

dissenting).  Nonetheless, the Supreme Court has long held that the Commerce Clause goes further and imposes limitations on the states even when Congress hasn't acted.  *Wayfair*, 138 S. Ct. at 2089.  This negative, or dormant, Commerce Clause requires courts to preserve the "free flow of interstate commerce," *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 770 (1945), with the aim of preventing the "economic Balkanization" that plagued the early colonies, *Wayfair*, 138 S. Ct. at 2089 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979)).

The Supreme Court has articulated two principles for applying the dormant Commerce Clause.  "First, state regulations may not discriminate against interstate commerce."  *Id.* at 2091.  Once a regulation is found to be discriminatory, it is "virtually *per se*" invalid.  *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).  Second, if the regulation isn't discriminatory, the doctrine still asks whether the state has imposed an "undue burden[] on interstate commerce."  *Wayfair*, 138 S. Ct. at 2091.  Specifically, state policies effectuating "a legitimate local public interest . . . will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  A theme throughout is that courts should inquire whether the policy "is basically a protectionist measure."  *City of Philadelphia*, 437 U.S. at 624; *see also Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 378 (6th Cir. 2013) (Sutton, J., concurring) ("The key point of today's dormant Commerce Clause jurisprudence is to prevent States from discriminating against out-of-state entities in favor of in-state ones."); Donald H. Regan, *The Supreme Court & State Protectionism:  Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1092 (1986) (arguing that the Supreme Court has been "concerned exclusively with preventing states from engaging in purposeful economic protectionism").

A.

Dormant Commerce Clause jurisprudence is famously complex.  *See* Saikrishna Prakash, *Our Three Commerce Clauses & the Presumption of Intrasentence Uniformity*, 55 Ark. L. Rev. 1149, 1169 (2003) (calling the doctrine "complicated and byzantine").  The Supreme Court itself has recognized the doctrine's "very considerable judicial oscillation."  *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 420 (1946); *see also Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167,

203 (1990) (Scalia, J., concurring) ("The 'negative' Commerce Clause is inherently unpredictable[.]"); *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 706 (1981) (Rehnquist, J., dissenting) (calling the doctrine "hopelessly confused"). As a lower court, we must chart a course through the doctrine's "cloudy waters." *Wardair Can., Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 17 (1986) (Burger, C.J., concurring in part and concurring in the judgment).

The parties agree that "discrimination" in the Commerce Clause context "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994). They also agree that both laws that discriminate on their face and those that discriminate in effect run afoul of the doctrine. They debate the role of purpose, however. Foresight Coal points to statements from this court and the Supreme Court that could be read to suggest that a discriminatory purpose, standing alone, can serve to invalidate a state's regulation of commerce. *E. Ky. Res. v. Fiscal Ct. of Magoffin Cnty.*, 127 F.3d 532, 540 (6th Cir.1997) ("A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect."); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (noting that a regulation may be unlawful because of a "discriminatory purpose or discriminatory effect" (citation omitted)). The Commission responds with *Comptroller of the Treasury v. Wynne*, which stated that "the Commerce Clause regulates *effects, not motives*, and it does not require courts to inquire into voters' or legislators' reasons for enacting a law that has a discriminatory effect." 575 U.S. 542, 561 n.4 (2015) (emphasis added). The Commission reads *Wynne* to say both that motive without effect can never be enough, and that a discriminatory effect suffices to invalidate a law, even absent discriminatory purpose. Thoughtful scholarship has offered a third approach, noting that in a string of cases before *Wynne* (and unrepudiated by it), the Court had upheld even discriminatory laws "in cases without evidence of a subjective intention to distort competition." Daniel Francis, *The Decline of the Dormant Commerce Clause*, 94 Denv. L. Rev. 255, 292 (2017) (collecting cases); *see also* Regan, *supra*, at 1092. On this theory, discriminatory purpose is necessary, though perhaps never sufficient; and *Wynne* might be confined to the special realm of tax cases. Francis, *supra*, at 292.

Happily, we need not settle the place of protectionist purpose in the "quagmire" of Commerce Clause jurisprudence. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring). Here, the law discriminates, if not on its face, then in effect, and so we have no occasion to consider whether discriminatory purpose alone could ever suffice.[1] And, to the extent that a protectionist purpose is necessary, we find that too.

B.

The parties spend considerable energy debating whether SB 257, which does not mention any state by name, nonetheless discriminates on its face. Foresight Coal says that it does because it "extend[s] beneficial treatment to producers from severance-tax states" and denies them to others. Appellant Br. at 28. But in the Commission's view, that "is an argument that a facially neutral statute discriminates in effect." *Id.* at 24. Which party is right turns on how close a proxy must be before we may find facial discrimination. But, in this case, not much turns on the answer. Whether labeled as "facial" or "in effect" discrimination, SB 257 discriminates against out-of-state coal.

SB 257 requires the Commission to "evaluate the reasonableness of fuel costs in contracts and competing bids based on the cost of the fuel less *any coal severance tax imposed by any jurisdiction*." Ky. Rev. Stat. Ann. § 278.277(1) (emphasis added). A severance tax is a tax imposed by a state (or political subdivision) upon natural resources extracted or "severed" from the land within its borders.[2] *See Maryland v. Louisiana*, 451 U.S. 725, 759 (1981). Only the state from which a natural resource was extracted may impose a severance tax on it. *Id.* (noting that "Louisiana ha[d] no sovereign interest in being compensated for the severance of resources" outside of its borders). So "any coal" that has paid a severance tax to "any

---

[1]Still, we are skeptical. It's hard to "imagine a case in which a state legislature intended to discriminate against interstate commerce but did not make that purpose clear in the statute (and thereby did not facially discriminate) and also failed to achieve that purpose (and thereby did not discriminate in effect)." *Wynne v. Comptroller of Md.*, 228 A.3d 1129, 1142 n.28 (Md. 2020); *see also Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 89 (1st Cir. 2021). Nor would such a case seem practically problematic. *See Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 654 (1994) ("[T]he flow of commerce is measured in dollars and cents, not legal abstractions.").

[2]That a municipality could, in theory, impose a severance tax makes no difference for Commerce Clause purposes. *See Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 357, 361 (1992) (rejecting the state's argument that policies did "not discriminate against interstate commerce on their face or in effect because they" differentiated based on "county").

jurisdiction" necessarily originated in that jurisdiction, and SB 257's text requires the Commission to discount coal that has paid severance taxes.  Quite plainly then, the statute demands that coal from non-severance taxing states (e.g., Illinois) be treated one way, and coal from severance-taxing states (e.g., Kentucky) another.  Even coal from the various severance-taxing states is given further disparate treatment, depending on the amount of each state's tax.  Thus, applying SB 257 starts *and* ends with the state.  The fact of the severance tax is, therefore, a near perfect proxy for the coal's state of origin.

Acknowledging the proxy problem, the Commission argues that SB 257 doesn't differentiate based on state because coal from the same state may be treated differently.  For example, "Montana imposes a different severance tax based on how the coal is severed . . . and the coal's heating quality."  Appellee Br. at 23.  But regardless of whether all Montana coal is treated the same, Montana coal is treated differently from coal in other states by virtue of its being Montana coal.  Applying SB 257 to Montana coal still starts and ends with the state, even if that state's law is more complex.

Does this tight correlation mean that we should call SB 257's severance-tax-based discrimination "facial" state-of-origin discrimination?  The question is interesting but ultimately unimportant.  Whether a law discriminates in explicit terms against out-of-state goods, or does so merely "in effect," the result is the same.  As is true of other constitutional doctrines, "[t]he commerce clause forbids discrimination, whether forthright or ingenious."  *Best & Co. v. Maxwell,* 311 U.S. 454, 455 (1940); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").  So a law discriminatory in effect must be justified as if it discriminated on its face. *See Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) ("When a state statute clearly discriminates against interstate commerce, it will be struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." (citation omitted)).

## C.

The real question then is not whether SB 257 *differentiates* between in-state and out-of-state coal but whether it impermissibly *discriminates*, as that term is used in the Commerce

Clause. That is, does the law benefit in-staters and burden outsiders? *Or. Waste Sys.*, 511 U.S. at 99. We conclude it does. SB 257 requires the Commission to treat coal that has paid severance taxes (to Kentucky or the handful of other states that impose them) better than it treats coal that has not paid such a tax: Coal from severance tax states is artificially discounted by the amount of the tax; other coal is not discounted at all. So, "[t]he [Kentucky] provision at issue here explicitly deprives certain products of generally available beneficial [regulatory] treatment because they are made in certain other States . . . ." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988).

The Commission points out that some out-of-state coal could *benefit* from SB 257—if that state had a higher severance tax than Kentucky. But that can't save the statute. In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court held that a North Carolina statute forbidding nonfederal grading of apples violated the Commerce Clause because it stripped Washington of the competitive and economic advantages of its superior grading system, while giving a boost to North Carolina's apples. 432 U.S. 333, 351 (1977). The North Carolina statute also benefitted apple producers from nearly half of the other states competing in the North Carolina apple market, which had no state grading systems of their own. *See id.* at 349. But that made no difference to the Court. *Id.*; *see also Lohman*, 511 U.S. at 645, 649–50 (rejecting the contention that the "overall effect of the use tax scheme across the State was to place a lighter aggregate tax burden on interstate commerce than on intrastate commerce"). Nor could it. "The facial unconstitutionality of [a state regulation] cannot be alleviated by examining the effect of legislation enacted by its sister States." *Tyler Pipe Indus. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 242 (1987); *see also Freeman v. Hewit*, 329 U.S. 249, 256 (1946) ("The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment."). And, to violate the dormant Commerce Clause, a regulation needn't discriminate against every state or industry. *Limbach*, 486 U.S. at 276 ("[N]either a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown."); *Lohman*, 511 U.S. at 650 ("[D]iscrimination is appropriately assessed with reference to the specific subdivision in which applicable laws reveal differential treatment.").

The Commission raises several arguments in response. First, it points us to the standard of review. The district court declined "to find at this time that S.B. 257 discriminates in effect," concluding that there was "not enough evidence in the record to properly ascertain whether S.B. 257 will disadvantage states that do not impose severance taxes." *Foresight Coal Sales*, 2021 WL 5139491, at *9. The Commission says this is a finding of fact that we may set aside only if "clearly erroneous." *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430. But, as we will show, the district court didn't err by finding a wrong fact; it erred by asking the wrong question. So the district court's determination that SB 257 likely doesn't have a discriminatory effect (i.e., that it does not treat out-of-staters worse than in-staters) is a legal error that we review de novo. *Id.*

As for findings of fact, the district court found it "obvious that cost is an important factor in the reasonableness analysis" but that it is "only one factor that the Commission analyzes when conducting its reasonableness inquiry." *Foresight Coal Sales*, 2021 WL 5139491, at *9. The Commission's review is "holistic." *Id.* And, at least once, a utility purchased more expensive coal based on "other considerations." *Id.* From these facts, the district court essentially concluded that, even with SB 257 in effect, Kentucky utilities might still buy Illinois coal, based on factors besides cost, and still qualify for the fuel-adjustment clause. *Id.* Even if each of these findings is correct, they don't lead to a legal conclusion that SB 257 isn't discriminatory.

The question the Commerce Clause cases ask is whether SB 257 burdens Illinois coal— not whether that burden is so insurmountable that no Illinois coal will ever again be sold to a Kentucky utility. *See Or. Waste Sys.*, 511 U.S. at 99. The question isn't even whether Foresight will necessarily lose market share. Instead, any economic disadvantage will do—whether measured in loss of market share or in lost profits due to decreased prices. *W. Lynn Creamery*, 512 U.S. at 195 n.11 (forcing out-of-state industry "to cut its profits by reducing its sales price below the market price sufficiently to compensate" for an imposed disadvantage is "an economic barrier against competition"). We can see that in *Hunt*. There, the Court concluded that North Carolina's forced "downgrading" of Washington apples would "[a]t worst, . . . have the effect of an embargo against those Washington apples in the superior grades," and "[a]t best . . . will deprive Washington sellers of the market premium that such apples would otherwise command."

*Hunt*, 432 U.S. at 352.    Either effect constituted impermissible "discrimination against commerce." *Id.* at 353.

Here, Kentucky artificially discounts its own coal, and coal from other severance-tax states, by the amount of the tax.  Because non-severance-tax state coal gets no such discount, the effect is to make Illinois coal relatively more expensive.  That, in turn, will cause Illinois coal either to lose market share or to lower its price.  *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 195 n.11.  Either way, Illinois coal is worse off as a matter of basic economics and Supreme Court precedent.  And either result is sufficient to find discrimination.  *Id.*; *Hunt*, 432 U.S. at 352–53.

In this litigation, everyone agrees that cost is one of the most substantial factors for the utilities.  This is also common sense.  When Kentucky utilities incur high energy costs, they want to be able to pass them on to customers; the fuel adjustment clause lets them do that.  *See* 807 Ky. Admin. Regs. § 5:056(1)(1).  But, to keep this ability, the utilities must pay "[]reasonable" prices for coal.  *Id.* § 5:056(3)(3)–(4).  Under SB 257, the Commission must discount severance taxes from the reasonableness calculation; the law gives it no discretion.  Ky. Rev. Stat. Ann. § 278.277.  And we assume that the Commission will follow the law.  *Cf. U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies." (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926))).  So coal from severance tax states will be treated as cheaper for the utilities (though not for their customers) by the amount of that severance tax.  The district court may well be right that the *amount* of loss is still unknown.  But "the magnitude and scope of the discrimination have no bearing on the determinative question whether discrimination has occurred." *Lohman*, 511 U.S. at 650; *see also Maryland*, 451 U.S. at 759–60 ("It may be true that further hearings would be required to provide a precise determination of the extent of the discrimination . . . but this is an insufficient reason for not now declaring the Tax unconstitutional.").

D.

SB 257 is also purposefully discriminatory.  To determine the purpose of a statute, we start with the text.  *Am. Bev. Ass'n*, 735 F.3d at 371.  Usually, the text is sufficient to determine purpose.  *E. Ky. Res.*, 127 F.3d at 542.  Such is the case here.

The text of SB 257 is plain: In calculating the reasonableness of fuel costs for Kentucky's utilities, the Commission must consider the "cost of the fuel less any coal severance tax imposed by any jurisdiction." The immediate goal of this text is to make severance-tax-state coal cheaper, which will, in turn, encourage Kentucky utilities to buy more coal from severance-tax jurisdictions, like Kentucky, and less from other states. And, as we have explained above, that purpose is discriminatory.

The parties debate the importance of the prior regulation and of various floor statements—some suggesting that the aim of the bill was to prop up the Kentucky coal industry, others suggesting that the legislators had no intent to "run afoul of interstate commerce." But none of that matters, at least not when the purpose is plain from the text. *See Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 648 (6th Cir. 2010). We note, moreover, that the Commission itself has offered only one purpose for SB 257: to "even out the playing field" between Kentucky coal and competing coal from non-severance tax states. And, as we explain next, that purpose is itself discriminatory.

III.

A.

The Commission's primary defense of SB 257 is that the law does not impermissibly discriminate within the meaning of the Commerce Clause because Kentucky coal isn't really advantaged by the policy; it's just no longer *dis*advantaged by Kentucky's own severance tax. Similarly, Illinois coal isn't really burdened by the policy, it's just no longer unfairly propped up by its state's *lack* of a severance tax. As the Commission puts it, SB 257 at most "evens a playing field" that the severance-tax states have tilted against themselves. Appellee Br. at 13. The Commission believes that such a law cannot be discriminatory. But a discriminatory policy is no less discriminatory because it has a "leveling" effect. In fact, the "leveling" effect may be precisely what is discriminatory.[3] *See Hunt*, 432 U.S. at 351 (holding that a state statute which had "a leveling effect" violated the Commerce Clause).

---

[3]The Commission offers *Lebamoff Enters. Inc. v. Whitmer*, where we briefly suggested in dictum that "evening the playing field" might be a "legitimate goal." 956 F.3d 863, 874 (6th Cir. 2020). But *Lebamoff* is a

This conclusion follows naturally from three principles in the Supreme Court's dormant Commerce Clause jurisprudence. First, one state's discriminatory policy doesn't authorize another's. *See Limbach*, 486 U.S. at 278 ("[E]ven if [an] Indiana subsidy were invalid [under the Commerce Clause], retaliatory violation of the Commerce Clause by Ohio would not be acceptable."). Such a tit for tat is precisely the kind of economic balkanization the dormant Commerce Clause seeks to prevent. *See Wayfair*, 138 S. Ct. at 2089. And "[a]ny other rule would mean that the constitutionality of [a regulation] would depend" on the laws in "49 other States." *Armco Inc. v. Hardesty*, 467 U.S. 638, 644–45 (1984). So SB 257 isn't somehow justified by Illinois' policy not to have a severance tax.

Second, with one exception discussed below, a policy that benefits out-of-state interests doesn't justify another that burdens them. In *Armco Inc. v. Hardesty*, the Court rejected West Virginia's argument that it could exempt local manufacturers from a gross receipts tax because they paid "a much higher manufacturing tax." 467 U.S. at 641–42. In *Tyler Pipe*, the Court invalidated Washington's exemption to its manufacturing tax for goods sold locally, even though "absent the exemption, a local manufacturer might be at an economic disadvantage because it would pay both a manufacturing and a wholesale tax, while the manufacturer from afar would pay only the wholesale tax." 483 U.S. at 243. And, in *Baldwin*, the Court held that New York couldn't protect local milk, which had to conform to New York minimum price laws, from Vermont milk, which had no such minimum price restrictions. 294 U.S. at 520, 528. The caselaw is clear: SB 257 must be judged discriminatory or not, regardless of other Kentucky policies that might benefit out-of-state coal. So SB 257 isn't justified by Kentucky's severance tax.

Third, a policy is discriminatory if its claim to neutrality depends on another state enacting the same policy. *See id.* at 521 ("New York has no power to project its legislation into Vermont."). The Court has repeatedly rejected attempts by states to condition favorable

---

Twenty-First Amendment case, which has an "accordion-like interplay" with the Commerce Clause and, therefore, requires a "different" test. *Id.* at 869, 871. "The Twenty-first Amendment 'gives the states regulatory authority that they would not otherwise enjoy." *Id.* (quoting *Tenn. Wine & Spirits Retailers Assoc. v. Thomas*, 139 S. Ct. 2449, 2474 (2019)). *Lebamoff* didn't consider *Limbach*, *Hunt*, or the other dormant Commerce Clause cases. Anyway, our comment about legitimate ends was just one response to a "doubtful" piece of legislative history that didn't affect the outcome. *Id.* at 874.

treatment for out-of-state interests on reciprocal or similar legislation. *See, e.g.*, *Tyler Pipe*, 483 U.S. at 242; *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 380–81 (1976); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941 (1982). In *Limbach*, the state regulation at issue gave tax subsidies to local ethanol as well as to out-of-state ethanol that returned the favor. 486 U.S. at 272. Nonetheless, the Court found that the state regulation was facially discriminatory, even though "many States" would be treated equally. *Id.* at 271; *see also Hunt*, 432 U.S. at 349 (holding that North Carolina's statute banning state grading of apples was discriminatory even though six other states also had no state grading). So, here, SB 257's discrimination isn't alleviated either by the fact that some states already impose severance taxes (in varying amounts) and that others *may* choose to impose severance taxes of their own. *See Tyler Pipe*, 483 U.S. at 242 (1987) (noting that a discriminatory policy cannot be alleviated by "examining the effect of legislation" in other states).

A contrary result in this case would violate these three principles. And it would mean that a state could "force its own judgments" on other states by using access to its market to encourage them to enact certain policies. *See Cottrell*, 424 U.S. at 380. A state with a high minimum wage, like Illinois, or California, might, for example, manipulate its sales tax to "level out" its high labor costs relative to states like Kentucky, whose policy has been to track the federal minimum wage. Ky. Rev. Stat. Ann. § 337.275. This process could play out in every state; no doubt every tapestry of regulations has some economic effects to "even out." But the principal aim of the dormant Commerce Clause cases is to avoid such "commercial warfare." *See H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949).

## B.

The Commission draws our attention to the one exception where the Supreme Court has deemed leveling a permissible purpose. In *Henneford v. Silas Mason Co.*, the Supreme Court held that a 2% use tax on out-of-state goods did not violate the Commerce Clause because it was equivalent to the 2% sales tax on goods sold in the state. 300 U.S. 577, 579–81 (1937). The Court pointed to the complementary nature of the two taxes, noting that "retail sellers in Washington will be helped to compete upon terms of equality with retail dealers in other states who are exempt from a sales tax or any corresponding burden." *Id.* at 581. The Commission

compares SB 257 to the use tax in *Silas Mason*, arguing that SB 257 helps Kentucky coal "compete upon terms of equality" with Illinois coal not subject to a severance tax. *See id.*

Initially, we note that *Silas Mason* confirms our conclusion that leveling the playing field is discriminatory under the Commerce Clause. A compensatory tax à la *Silas Mason* is still a facially discriminatory tax, just one that is sufficiently justified. *See Or. Waste Sys.*, 511 U.S. at 102 ("Though our cases sometimes discuss the concept of the compensatory tax as if it were a doctrine unto itself, it is merely a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means.").

And *Silas Mason* created a narrow exception. *See Fulton Corp. v. Faulkner*, 516 U.S. 325, 344 (1996) ("While we doubt that . . . a [compensatory tax] showing can ever be made outside the limited confines of sales and use taxes, it is enough to say here that no such showing has been made."); *Or. Waste Sys.*, 511 U.S. at 105 n.8 (calling the compensatory tax cases "carefully confined"). The compensatory tax exception exists to ensure that states can collect revenue through sales taxes, *see generally Wayfair*, 138 S. Ct. at 2096, but it has not extended further, *Fulton*, 516 U.S. at 338 (The Supreme Court "ha[s] shown extreme reluctance to recognize new compensatory categories"; indeed, "use taxes on products purchased out of state are the only taxes [the Court] ha[s] upheld in recent memory under the compensatory tax doctrine"). It does not apply here.

First, SB 257 is not a tax. *Silas Mason* appears to extend only to use taxes—not even other kinds of taxes—so it certainly doesn't apply to regulatory schemes that aren't taxes at all. *See Fulton*, 516 U.S. at 344. Expanding *Silas Mason* to a non-tax would hardly keep the doctrine "carefully confined," as the Supreme Court has directed us to do. *Id.* at 335 (quoting *Or. Waste Sys.*, 511 U.S. at 105 n.8). Second, even if SB 257 were a tax, it wouldn't qualify for the *Silas Mason* exception. Compensatory taxes must meet three criteria. First, the State must identify a "burden for which the State is attempting to compensate." *Tyler Pipe*, 483 U.S. at 242 (quoting *Maryland*, 451 U.S. at 758). Second, the State must demonstrate "[e]qual treatment of interstate commerce." *Id.* at 243 (quoting *Bos. Stock Exch.*, 429 U.S. at 331) (alteration in original). Third, the State must show "'substantially equivalent' events on which the 'mutually

compensating taxes'" are imposed. *Id.* at 244 (quoting *Armco*, 467 U.S. at 643). SB 257 doesn't pass the test.

The "substantially equivalent" prong asks whether the taxes fulfill the same purpose. *Tyler Pipe*, 483 U.S. at 244. But the purpose of the severance tax and SB 257 are different. We know this because the Supreme Court told us so in a remarkably similar case. In *Maryland v. Louisiana*, the Supreme Court held that a severance tax is not substantially equivalent to a use tax. 451 U.S. at 759. There, Louisiana had a 7-cent severance tax for natural gas, imposed per thousand cubic feet extracted. *Id.* at 731. Concerned about the influx of gas from federal reserves in the Gulf of Mexico, Louisiana imposed an equivalent use tax on gas coming from territories without a severance tax. *Id.* Most states had a severance tax equal to Louisiana's at the time and would have been treated equally, but the Court still found that the use tax could not be justified as a compensatory tax; instead, it violated the Commerce Clause. *Id.* at 758–59. The Court emphasized the difference between a sales tax and a severance tax. Specifically, a severance tax serves the "interest in protecting [the State's] natural resources." *Id.* at 759. But a use tax could not be "designed to meet these same ends since Louisiana ha[d] no sovereign interest in being compensated for the severance of resources from [federally owned land]." *Id.* Here, Kentucky has no interest in the extraction of natural resources from Illinois land, so it can't enact a *Silas Mason*-like tax to level the effects of its severance tax. *Id.*

## C.

Framing the argument another way, the Commission contends that Illinois coal did not "earn" whatever advantage it had before the enactment of SB 257, so Kentucky is free to nullify it. But that argument also misunderstands Commerce Clause jurisprudence. The Commission gleans its "earned advantage" principle from *Hunt*. There, the Supreme Court held a statute unenforceable where it stripped away "the competitive and economic advantages [the Washington apple industry] ha[d] earned for itself through its expensive inspection and grading system." *Hunt*, 432 U.S. at 351. But *Hunt* didn't say that "unearned" advantages *could* be stripped away. The cases remark on whether there *is* an advantage; they do not turn on how it is derived. *See, e.g.*, *Or. Waste Sys.*, 511 U.S. at 99 (focusing on "differential treatment," not the

source of the difference); *W. Lynn Creamery*, 512 U.S. at 194 (asking whether the state policy "neutraliz[es] advantages belonging to the place of origin" (quoting *Baldwin*, 294 U.S. at 527)).

What's more, the Commission does not tell us what it means by "earned." It might mean that only the fruits of human labor and ingenuity, perhaps combined with the blessings of nature, are protected by the Commerce Clause. The Commission suggests, for example, that if Foresight had shown that its "coal [was] of a better quality" or that it could "transport its coal more cheaply or quickly," those advantages would be protected. Appellee Br. at 13. That leaves in the unprotected category state-created advantages, like (the lack of) a severance tax. But this argument is squarely foreclosed by *Hunt* itself; it was the Washington "state legislature [that] ha[d] sought to enhance the market for Washington apples through the creation of . . . the Washington State Apple Advertising Commission." 432 U.S. at 336. The state's "stringent, mandatory inspection program, administered by the State's Department of Agriculture" graded the apples. *Id.* And this state-created grading system was the advantage protected in *Hunt*. *Id.* The dormant Commerce Clause prohibited North Carolina from leveling the playing field that Washington law had tilted toward itself. *Id.* at 350.

*Limbach*, too, stands in the way. There, the Court took note of Indiana's cash subsidy "program for in-state ethanol producers," remarking that it was surely "effective in conferring a commercial advantage over out-of-state competitors." *Limbach*, 486 U.S. at 278. Still, the Court cautioned that Ohio could not erase the effects of this state-created advantage through a discriminatory tax: "Direct subsidization of domestic industry does not ordinarily run afoul of [the Commerce Clause]; discriminatory taxation of out-of-state manufacturers does." *Id.*

In any event, the Commission never explains how it would have us distinguish between human (or nature)-created and state-created advantages. How much of a business's "economic and competitive advantage" is traceable to natural resources or individual pluck? And what portion shall we assign to labor policies, the educational system, corporate tax rates, or environmental policy in the State? For good reason, the caselaw doesn't parse whether an advantage is state created. *See Tyler Pipe*, 483 U.S. at 234 (manufacturing taxes); *Limbach*, 486 U.S. at 271 (ethanol tax credits).

D.

Foresight Coal is likely to be able to show that SB 257 discriminates against interstate commerce.  There remains, however, the question whether that discrimination can nonetheless be justified.  Laws that discriminate against interstate commerce are "virtually per se" invalid, *City of Philadelphia*, 437 U.S. at 624.  But a few survive.  *E.g.*, *Maine v. Taylor*, 477 U.S. 131, 148 (1986) (upholding absolute ban on the importation of baitfish into Maine because of environmental risks).  Here, the Commission has proffered no explanation for SB 257 except that it is designed to nullify the competitive disadvantages created by Kentucky's severance tax.  *See City of Philadelphia*, 437 U.S. at 624 (noting that the "crucial inquiry" is whether the policy "is basically a protectionist measure" or is instead directed "to legitimate local concerns" with only "incidental" effects on interstate commerce).  Because Kentucky may not level the playing field in this way, Foresight Coal is likely to succeed on the merits.

\* \* \*

Having concluded that Foresight Coal was not likely to succeed on the merits, the district court declined to address the rest of the preliminary injunction factors.  We remand for the district court to examine the other three factors in the first instance.  *See Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 738 (9th Cir. 2017).

We REVERSE and REMAND for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in the judgment.  While I agree with the majority's conclusion, I depart slightly from the underlying analysis.

As I see it, SB 257 is not facially discriminatory.  To be sure, SB 257 treats different states differently based on their differing severance taxes.  But suppose Kentucky were to repeal its coal severance tax.  In that scenario, SB 257 would not favor Kentucky, meaning it would not discriminate against out-of-state interests.  Therefore, SB 257 does not discriminate on its face; it discriminates in effect due to the existence of Kentucky's coal severance tax.

SB 257 is discriminatory in effect because Kentucky's coal severance tax makes it discriminatory.  By requiring the Commission to pretend that the price of Kentucky coal is 4.5% lower than its true price, SB 257 gives Kentucky coal a comparative price advantage over out-of-state coal that does not receive this pretend discount.  This is virtually the same case as *New Energy Co. v. Limbach*, 486 U.S. 269 (1988), in which the Court rejected Ohio's attempt to deny its tax credit to Indiana's ethanol.  I would stop there and take the analysis no further.