RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

PHILLIP TRUESDELL; LEGACY MEDICAL TRANSPORT, LLC,

*Plaintiffs-Appellants*,

*v.*

No. 22-5808

ERIC FRIEDLANDER, in his official capacity as Secretary of the Kentucky Cabinet for Health and Family Services; ADAM MATHER, in his official capacity as Inspector General for the Kentucky Cabinet for Health and Family Services; CARRIE BANAHAN, in her official capacity as Deputy Secretary of the Kentucky Cabinet for Health and Family Services,

*Defendants-Appellees*,

FIRST CARE OHIO, LLC, fka Patient Transport Services, Inc.,

*Intervenor-Defendant-Appellee*.

———————

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:19-cv-00066—Gregory F. Van Tatenhove, District Judge.

Argued: March 8, 2023

Decided and Filed: September 1, 2023

Before: GRIFFIN, BUSH, and MURPHY, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Joshua Polk, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellants. David T. Lovely, CABINET FOR HEALTH & FAMILY SERVICES, Frankfort, Kentucky, for Defendants Appellees. David M. Dirr, DRESSMAN BENZINGER LAVELLE PSC, Covington, Kentucky, for Intervenor Appellee. **ON BRIEF:** Joshua Polk, Anastasia P.

Boden, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellants.  David T. Lovely, Wesley W. Duke, CABINET FOR HEALTH & FAMILY SERVICES, Frankfort, Kentucky, for Defendants Appellees.  David M. Dirr, Christopher B. Markus, DRESSMAN BENZINGER LAVELLE PSC, Covington, Kentucky, for Intervenor Appellee.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  Legacy Medical Transport, a small family-owned business, provides nonemergency ambulance services in several Ohio counties that border Kentucky. After receiving many inquiries from Kentucky hospitals and nursing homes, Legacy sought to expand into the Commonwealth.  But Kentucky required Legacy to show a "need" for its services and to apply for a "certificate of need" with the Kentucky Cabinet for Health and Family Services.  Unsurprisingly, existing ambulance providers (Legacy's potential competitors) objected to Legacy's request.  The Cabinet denied Legacy's application partly on the ground that these providers offered an adequate supply.  Legacy then sued various Cabinet officials, alleging that Kentucky's certificate-of-need law violated the "dormant" or "negative" part of the Commerce Clause.  The district court granted summary judgment in favor of the Cabinet officials.  We affirm in part and reverse in part.

We affirm with respect to Legacy's request to offer *intrastate* ambulance transportation in Kentucky.  Under the modern approach to the dormant Commerce Clause, a law's validity largely depends on whether it discriminates against out-of-state businesses in favor of in-state ones.  *See Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1152–53 (2023).  Yet Kentucky's law treats in-state and out-of-state providers the same.  Legacy responds that such a neutral law can still violate the dormant Commerce Clause if its interstate burdens exceed its local benefits under the "balancing" test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). And the company raises valid concerns about the wisdom of the law's limits on market competition.  For the most part, however, Legacy's evidence suggests that these limits will harm Kentucky's own "consumers"; it has not shown a "substantial harm" to interstate commerce. *Nat'l Pork Producers*, 143 S. Ct. at 1162–63 (plurality opinion).

That said, we reverse with respect to Legacy's request to offer *interstate* ambulance transportation between Kentucky and Ohio.  In *Buck v. Kuykendall*, 267 U.S. 307 (1925), the Court held that States may not deny a common carrier a license to provide interstate transportation on the ground that the interstate market contains an "adequate" supply.  *Id.* at 316. This bright-line rule barring States from obstructing interstate "competition" does not turn on a finding that a State has discriminated against out-of-state entities.  And while the district court thought that later cases had repudiated *Buck*, we find that claim debatable.  Besides, the Court has told us that we must follow a directly controlling case even if later decisions call it into doubt.  *Buck* controls here.

I

A

Phillip Truesdell's hometown—Aberdeen, Ohio—sits on the banks of the Ohio River just north of Maysville, Kentucky.  For years, a power plant operated in this town.  With his son and daughter, Truesdell provided maintenance services to the plant.  But the plant closed in 2017, ending Truesdell's power-plant business.  Not wanting to see his children and grandchildren leave the Aberdeen area, Truesdell investigated other businesses that might give his children a steady stream of income while keeping them nearby.

Legacy Medical Transport—a limited liability company that provides nonemergency ambulance services—grew out of these entrepreneurial efforts.  After seeing an ambulance for sale, Truesdell asked his daughter, Hannah Howe, to research whether they could operate this type of company.  Howe found the business viable.  In October 2017, she incorporated Legacy for Truesdell, the company's sole owner.

Before Legacy could serve Ohio customers, it had to apply for an Ohio license.  Legacy encountered no difficulties in that process.  Ohio merely required Legacy to fill out a "one-page inspection sheet."  Howe Dep., R.107-2, PageID 3207.  A regulator then visited the company's Aberdeen property to inspect its ambulance, buildings, and protocols.

Legacy started serving Ohio customers in January 2018. The company provides "basic" (in contrast to "advanced") life-support transportation services. Howe Dep., R.105-2, PageID 2036. It mainly transports nursing-home residents to doctors' offices or hospitals for medical visits. During every run, one EMT drives the ambulance and a second EMT sits in it. But Legacy does not provide any transportation services that would require a paramedic to administer medications or place IVs. It thus does not undertake "emergency" runs, such as those that arise when a person in distress calls 911.

Legacy's operations have grown rapidly. The company has made thousands of runs in the Ohio counties that it serves. It has hired ten employees and amassed a six-vehicle fleet. Truesdell now leaves Legacy's day-to-day operations to his daughter and son. His daughter manages the business; his son services the ambulances. The company gets paid from the Medicare or Medicaid programs for about 90% of its Ohio runs and from private insurers for most of the remaining 10%.

B

1. But this case concerns Legacy's efforts to operate in Kentucky. Kentucky does not allow the free market to determine the supply of health-care services. Its legislature believes that unrestrained competition will lead to "unnecessary health-care facilities" and result in the "costly duplication and underuse" of these facilities. Ky. Rev. Stat. § 216B.010. So before a business may open a new "health facility"—including a facility providing ambulance services—the business must obtain a "certificate of need." *Id.* § 216B.061(1)(a); *see id.* § 216B.015(13).

The Kentucky Cabinet for Health and Family Services oversees this certificate-of-need law. *Id.* §§ 216B.015(6), 216B.040(1)(a). The law instructs the Cabinet to evaluate various factors when deciding whether to grant a certificate of need to an ambulance provider. The Cabinet must consider, among other things, (1) whether the proposed ambulance services would be "consistent with the state health plan"; (2) whether the applicant has shown a "need" for the services in the identified area and would make them "accessible to all"; (3) whether the proposal would allow for "effective linkages" between the ambulance services and other health

care; and (4) whether the proposal would efficiently "use" health-care "resources[.]" *Id.* § 216B.040(2)(a)(2).

The second factor is at issue here. To meet that factor, an applicant seeking to offer ambulance services must show a "need" for them in a "defined" "geographic service area" and prove that it can meet this need. 900 Ky. Admin. Regs. 6:070 § 2(2). The Cabinet otherwise has no benchmarks to guide this "need" inquiry. Applicants commonly produce letters of support from local government officials, conduct statistical analyses of the ambulance market, or ask local medical professionals to opine about the lack of services. Competitors who oppose the expansion typically use similar evidence in rebuttal. They might attempt to show that they respond promptly to calls or have the capacity to take on additional runs.

To obtain a certificate of need, an ambulance provider must submit a form "application" to the Cabinet and pay the required fee ($1,000 for smaller projects). Ky. Rev. Stat. § 216B.062(1); 900 Ky. Admin. Regs. 6:020 § 1(2), 6:055 § 2(2), 6:065 § 2(1). Once the Cabinet finds the application complete, it will issue a public notice to ensure that interested parties learn of the proposal. Ky. Rev. Stat. § 216B.062(1); 900 Ky. Admin. Regs. 6:060 § 2(1)(c); 6:065 § 4(2)–(3). "[A]ny affected person," including a competing ambulance provider, may protest the application and request a hearing over whether the Cabinet should grant it. Ky. Rev. Stat. §§ 216B.015(3), .085(1). A Cabinet hearing officer will conduct the hearing. 900 Ky. Admin. Regs. 6:090 § 3(1)–(2). Applicants and affected parties (including competitors) may present evidence. Ky. Rev. Stat. § 216B.085(3); 900 Ky. Admin. Regs. 6:090 § 3(12). And the officer's decision must rest solely on the "record," including the hearing evidence. Ky. Rev. Stat. §§ 216B.015(24), .085(4).

If an ambulance provider makes it through this process and receives a certificate of need, it must next apply for a license with the Kentucky Board of Emergency Medical Services. 202 Ky. Admin. Regs. 7:501 § 1, 7:545E § 1(3); *see* Ky. Rev. Stat. § 311A.020(1)(c)(6). That agency has adopted its own licensing rules to regulate such things as the provider's ambulances, equipment, management, and staff. *See* 202 Ky. Admin. Regs. 7:550, 7:555E, 7:560.

This regulatory regime applies to all ambulance providers that seek to offer *intrastate* transportation in Kentucky. According to the Cabinet, however, the regime does not apply to some *interstate* trips. Appellees' Br. 4–5. Ambulance providers licensed in other States do not need a certificate of need to transport patients through Kentucky. 202 Ky. Admin. Regs. 7:501 § 6(2)(b). Out-of-state providers also may transport patients from outside Kentucky "to a Kentucky medical facility or other location in Kentucky" without obtaining a certificate of need. *Id.* § 6(2)(a). And out-of-state providers do not need such a certificate to take nonresidents "from a Kentucky health care facility" "back to their" home State. *Id.* § 6(2)(d). The law thus applies only to interstate trips transporting a Kentuckian from the Commonwealth to another State.

2. Legacy's Aberdeen station sits only seven miles from a hospital in Maysville, Kentucky. Given Legacy's proximity to the Kentucky market, Howe estimated that it has received daily calls from Kentucky hospitals or nursing homes requesting its services. Because Legacy does not have a certificate of need, however, it cannot offer trips within Kentucky. And while it can take patients from a location in Ohio (or other States) to a "location in Kentucky," *id.* § 6(2)(a), it may not take Kentuckians to Ohio locations, *id.* § 6(2)(d). So Legacy has declined many of these calls.

In light of this untapped demand, Legacy applied for a certificate of need with the Cabinet in 2018. The company sought to provide its "basic" (nonemergency) ambulance services from its Aberdeen station to customers in several northern Kentucky counties.

Legacy's application was met by a deluge of protests. Four entities that provide ambulance services in the areas that Legacy proposed to serve (a private competitor, two county emergency medical service providers, and a fire department) objected to Legacy's competition. A Cabinet hearing officer thus held a hearing on Legacy's application.

The officer denied a certificate of need to Legacy for several reasons, including that Legacy had not shown a need for more ambulance services in the relevant counties. Legacy had estimated that it would make 300 runs per year based on the number of times that patients had asked Legacy for transportation from Kentucky to Ohio, which Legacy could not supply because

of the certificate-of-need law.  According to the officer, Legacy had not shown that these patients "experienced difficulty in securing" other transportation.  Order, R.107-12, PageID 4988.  The officer also saw no evidence that other patients had been unable to obtain ambulance services or that Legacy's would-be competitors were "operating at capacity[.]"  *Id.*

In response, Legacy and Truesdell (collectively, "Legacy") brought this suit against several Cabinet officials (collectively, the "Cabinet").  The company challenged the substantive rule requiring it to show a "need" for its services and the procedural rule allowing competitors to object to its application—both of which allegedly created a "Competitor's Veto."  Compl., R.63, PageID 650.  Legacy claimed that these two features of Kentucky's certificate-of-need law violated the dormant Commerce Clause, the Due Process Clause, the Privileges or Immunities Clause, and the Equal Protection Clause.  It sought an injunction against the challenged parts of the law.

At the pleading stage, the district court dismissed all but Legacy's dormant-commerce claim.  *See Truesdell v. Friedlander*, 2022 WL 1394545, at *2–7 (E.D. Ky. May 3, 2022).  After discovery, the court then granted summary judgment to the Cabinet on this remaining claim.  *See Truesdell v. Friedlander*, 626 F. Supp. 3d 957, 964–72 (E.D. Ky. 2022).

Legacy has appealed, raising three constitutional challenges.  We can make short work of its first challenge: that Kentucky's regime violates the Fourteenth Amendment's Privileges or Immunities Clause.  In the *Slaughter-House Cases*, 83 U.S. 36 (1873), the Court upheld a law granting a monopoly to a local slaughterhouse against a similar privileges-or-immunities claim. *Id.* at 72–80.  As Legacy concedes, *Slaughter-House* forecloses its argument.  Appellants' Br. 47. But it has preserved that argument for further review in the Supreme Court.

This conclusion leaves Legacy's two challenges to Kentucky's "need" requirement under the dormant Commerce Clause.  Legacy raises both a broad challenge and a narrow one.  As a broad matter, Legacy asserts that Kentucky's certificate-of-need law violates the Commerce Clause in all applications, even those that involve purely *intrastate* ambulance trips within Kentucky.  As a narrow matter, Legacy asserts that this need requirement at least runs afoul of the Commerce Clause as applied to *interstate* ambulance runs that cross between Kentucky and

Ohio. We take these arguments in turn, reviewing them de novo. *See Ferndale Lab'ys, Inc. v. Cavendish*, 79 F.3d 488, 492 (6th Cir. 1996).

## II. Broad "Intrastate" Challenge

The Constitution gives Congress the power to "regulate Commerce . . . among the several States[.]" U.S. Const. art. I, § 8, cl. 3. Some of the Constitution's other grants of authority to Congress come with twin prohibitions barring the States from exercising the same power. So, for example, the Constitution both grants Congress the power "[t]o coin Money" and denies the States the power to "coin Money[.]" *Compare* U.S. Const. art. I, § 8, cl. 5, *with id.* art. I, § 10, cl. 1. The Commerce Clause lacks such a twin. Nevertheless, the Supreme Court eventually held that the clause of its own force prohibits the States from restricting interstate trade even when Congress has not passed a law imposing such a limit on them. *See Nat'l Pork Producers*, 143 S. Ct. at 1152–53; *see also* David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years, 1789–1888*, at 168–81, 222–36, 330–42, 403–16 (1985) (recounting history).

The Court's modern cases applying this "dormant" or "negative" part of the Commerce Clause divide the legal inquiry into two steps. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994); *Foresight Coal Sales, LLC v. Chandler*, 60 F.4th 288, 295 (6th Cir. 2023). At step one, a court must ask if a challenged state law "discriminates" against out-of-state economic interests to benefit local economic interests. *C & A Carbone*, 511 U.S. at 390. This "antidiscrimination rule" represents "the core" principle of the Court's "dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 143 S. Ct. at 1157. So if a law discriminates, the courts will "almost always" find it invalid, *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018), and States must meet a demanding test to save it, *see Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005). If a law does not discriminate in this way, a court must ask at step two whether it nevertheless inflicts a "substantial harm" on interstate commerce. *Nat'l Pork Producers*, 143 S. Ct. at 1162–63 (plurality opinion). If so, the law may still violate the Commerce Clause if its interstate "burden[s]" "clearly" exceed its "local benefits" under a benefits-burdens balancing test that the Supreme Court adopted in *Pike*, 397 U.S. at 142.

Legacy argues that Kentucky's certificate-of-need law flunks both steps. According to Legacy, the law discriminates against out-of-state ambulance providers. At the least, it claims that the law's interstate burdens clearly exceed its in-state benefits under *Pike* balancing. Although the Cabinet responds that Legacy forfeited its discrimination claim, we find this argument debatable and so opt to reject both claims on the merits.

A. *Does Kentucky's law discriminate against out-of-staters?*

Legacy first argues that we should find Kentucky's certificate-of-need law presumptively invalid because it "discriminates" against out-of-state ambulance providers. *C & A Carbone*, 511 U.S. at 390. To reject this argument, we must start by distinguishing a *discriminatory* law (which triggers rigorous scrutiny) from a *neutral* law (which does not). According to the usual definition, a discriminatory law treats "in-state and out-of-state economic interests" differently by "benefit[ing] the former and burden[ing] the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994)). So a West Virginia law discriminated against interstate commerce by taxing interstate transactions but not intrastate transactions, thereby effectively imposing a "tariff" on the goods of out-of-state manufacturers. *See Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984); *see e.g.*, *Tenn Wine & Spirits*, 139 S. Ct. at 2461.

Conversely, a neutral law that "regulates even-handedly" by treating interstate and intrastate commerce the same does not discriminate against interstate commerce simply because it affects more out-of-state businesses than in-state ones. *Pike*, 397 U.S. at 142; *see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470–74 (1981); *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978). For example, a California law that imposed uniformly strict regulations on the production of all pork sold in the State—whether produced inside or outside its borders—applied neutrally. *See Nat'l Pork Producers*, 143 S. Ct. at 1153. The law did not "discriminate" against out-of-state producers even if most of the production occurred outside California. *See id.* at 1151–52; *see also Clover Leaf Creamery*, 449 U.S. at 471–72; *Exxon*, 437 U.S. at 125–26.

How should courts distinguish discriminatory laws designed to help local businesses from neutral laws designed to achieve other goals?  We have traditionally asked three questions to ferret out laws that seek to achieve improper "economic protectionism": Does the law discriminate *on its face* against interstate commerce?  If not, does it have a *discriminatory effect* on that commerce?  And if not, did the legislature pass the law to achieve a *discriminatory purpose*?  *See LensCrafters*, 403 F.3d at 802.  Kentucky's certificate-of-need law passes muster under all three inquiries.

*Inquiry One: Does Kentucky's law discriminate on its face?*  A prototypical discriminatory law will differentiate on its "face" (that is, expressly) between in-state and out-of-state commerce or entities.  *Foresight Coal Sales*, 60 F.4th at 296.  The West Virginia tax law in *Armco* provides an obvious example of this sort of law.  467 U.S. at 642.  "On its face," this law treated interstate manufacturers worse than intrastate ones by taxing only the sales of the former group.  *Id.*

Yet *C & A Carbone* shows that a law's facial discrimination need not be so precise. There, the Town of Clarkstown agreed to have a local contractor operate a trash-processing facility.  511 U.S. at 387.  Clarkstown guaranteed that the contractor would receive a certain quantity of trash to process each year.  *Id.*  To meet this guarantee, the town passed a "flow control ordinance" that required residents to send their trash to the facility.  *Id.*  The Court held that this ordinance facially "discriminate[d]" against out-of-state processors by permitting "only the favored operator to process waste that is within the limits of the town."  *Id.* at 391. Clarkstown had argued that its grant of a monopoly treated in-state and out-of-state facilities the same because none could process the trash set aside for the contractor.  *Id.*  But the Court refused to find the ordinance neutral simply because it disfavored all other processors—whether in-state or out-of-state.  *Id.* at 391–92.  The Court reasoned that the ordinance discriminated against interstate commerce because it favored one "local" processor at the expense of "out-of-state competitors or their facilities."  *Id.* at 394.

At the same time, our decision in *Garber* teaches that a law can be facially neutral even if it refers to a State's borders.  There, an Ohio law tolled the statute of limitations for tort claims each day that a defendant spent outside the State.  888 F.3d at 841–43.  We held that the law did

not facially discriminate because it drew "no distinctions based on residency." *Id.* at 843. Both an Ohioan and an Alaskan were subject to the tolling provision whenever they remained outside Ohio. *Id.*

Kentucky's certificate-of-need law looks more like the Ohio law in *Garber* than the Clarksville ordinance in *C & A Carbone*. Nothing on the face of this law "explicitly" favors in-state ambulance providers over out-of-state providers. *Id.* The law requires *every* "person" that seeks to offer ambulance services to obtain a certificate of need. Ky. Rev. Stat. § 216B.061(1)(a). And it defines "person" to include in-state and out-of-state entities. *Id.* § 216B.015(22). Likewise, Kentucky's law gives "any affected person" the right to challenge any applicant's proposal. Ky. Rev. Stat. §§ 216B.015(3), .085(1). So an out-of-state competitor may challenge an in-state applicant. Kentucky's law thus facially "imposes the same burdens" and grants the same benefits to "in-state" and "out-of-state" providers alike. *Nat'l Pork Producers*, 143 S. Ct. at 1153. As the Fourth Circuit held when rejecting a similar challenge to a certificate-of-need law, this equal treatment means that the law is "not facially discriminatory." *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 152 (4th Cir. 2016) (Wilkinson, J.); *see also Ferndale*, 79 F.3d at 495.

Legacy responds that Kentucky's law engages in the same facial discrimination as the Clarkstown ordinance in *C & A Carbone* because it bars new *out-of-state* entrants who fail to obtain a certificate of need from competing with incumbent providers. Under *C & A Carbone*, Legacy adds, this fact makes the law discriminatory even if it also harms new *in-state* entrants too. After all, *C & A Carbone* held that the ordinance facially discriminated even though it harmed both out-of-state and in-state processors. 511 U.S. at 391. Yet Legacy overlooks a key distinction. The ordinance in *C & A Carbone* granted a monopoly to a "*local* enterprise[.]" *Id.* at 394 (emphasis added). Kentucky's law, by contrast, does not automatically grant certificates of need to local entities; it neutrally requires everyone to apply. So Kentucky's law does not engage in the explicit discrimination against out-of-state entities that *C & A Carbone* forbids.

*Inquiry Two: Does Kentucky's law have a discriminatory effect?* Even if a statute appears facially neutral, it still might discriminate against interstate commerce in its operation.

*See Foresight Coal Sales*, 60 F.4th at 296.  These types of real-world effects can render the law "discriminatory" and so presumptively invalid.  *See, e.g.*, *id.* at 296–97.

Critically, however, a court must not confuse a law that has only a disparate impact on out-of-state businesses for one that has discriminatory effects on interstate commerce.  Assume that a State decides to regulate a market made up of primarily out-of-state suppliers.  By definition, *any* regulation of that market will affect more out-of-state suppliers than in-state ones.  Yet the Court's decision in *Exxon* shows that this disparate impact alone does not suffice.  The Maryland law in that case did not permit gasoline producers to vertically integrate and operate ordinary retail gas stations in the State.  *Exxon*, 437 U.S. at 119–21.  This law had a 100% disparate impact on out-of-state companies because Maryland imported all of its gas.  *Id.* at 125.  But this economic fact did not prove a discriminatory effect.  *See id.* at 125–26.  Why? The law did not give a "competitive advantage" to in-state entities over out-of-state entities.  *Id.* at 126.  That is, it had no "reallocation" effects by incentivizing consumers to shift market share to in-state gas from out-of-state gas.  *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995).  Instead, it shifted market share from producer-owned retailers to independent retailers.  *See Nat'l Pork Producers*, 143 S. Ct. at 1161 (plurality opinion).  But the Commerce Clause does not bar a State from disfavoring certain corporate forms as long as that discrimination will not cause consumers to shift away from interstate commerce.  *See id.*

By contrast, our decision in *Foresight Coal Sales* illustrates a law with the required effects.  When regulating the rates that public utilities may charge consumers, Kentucky's Public Service Commission encourages utilities to buy the cheapest coal.  *See* 60 F.4th at 293.  Because Kentucky imposes a severance tax on Kentucky coal, this tax made in-state coal more expensive and so discouraged Kentucky utilities from buying it.  *See id.*  Kentucky thus passed a law ordering the Commission not to take severance taxes into account when evaluating the utilities' rates.  *See id.* at 294.  We held that this law had a discriminatory effect because it "artificially discounted" the cost of coal from severance-tax States (like Kentucky) at the expense of States without such a tax.  *Id.* at 298–300.  "[A]s a matter of basic economics," the change in the relative costs favored Kentucky coal and harmed out-of-state coal from non-tax States.  *Id.* at 299; *see also McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 442 (6th

Cir. 2000). In short, a facially neutral law has a discriminatory effect if it gives in-state entities a "competitive advantage" that will lead consumers to shift market share to those entities. *Exxon*, 437 U.S. at 126.

This definition of "discriminatory effects" dooms Legacy. Both as a matter of economic theory and as a matter of empirical evidence, Legacy has not shown that Kentucky's certificate-of-need law will shift (or has shifted) market share to in-state ambulance providers by giving them a "competitive advantage" over out-of-state ones. *Id.* For starters, Legacy identifies no economic principle showing that Kentucky's "need" requirement for new entrants will somehow incentivize consumers to prefer in-state ambulance providers. *Foresight Coal Sales*, 60 F.4th at 299. As far as we can tell, the relative cost structures for in-state ambulance providers and out-of-state ambulance providers will remain the same with or without this "need" requirement.

Next, the operation of Kentucky's law fails to disclose any discriminatory effects on out-of-state ambulance providers. The Cabinet's unchallenged statistics show that the agency has approved applications from in-state and out-of-state providers at virtually identical rates. In fact, local applicants succeed *less* often, receiving certificates to operate ambulance services at a rate of 55% compared to the outsiders' rate of 56%. Sullivan Rep., R.107-4, PageID 3401. Legacy also cites no evidence that local providers mount protests (or that outsiders face them) more often. *Cf. Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 434–36 (2005). So the law has treated in-state and out-of-state entities the same. *Cf. Colon Health Ctrs.*, 813 F.3d at 153.

To be sure, Legacy suggests that the law favors *incumbents* who have obtained certificates of need over *new entrants* who seek those certificates. According to Legacy, a strong correlation exists between the Cabinet's denial of a certificate and an incumbent competitor's objection to an application. That correlation does not change things. This case may well involve incumbency favoritism. But that favoritism is not the type of discrimination that sits "at the core" of the dormant Commerce Clause: discrimination against out-of-staters. *Nat'l Pork Producers*, 143 S. Ct. at 1157; *see Colon Health Ctrs.*, 813 F.3d at 154. Just as the law in *Exxon* did not discriminate against interstate commerce merely because it favored independent gas stations over producer-owned gas stations, 437 U.S. at 126–27, so too Kentucky's "need" law

does not discriminate against interstate commerce simply because it favors incumbents over new entrants. The Commerce Clause does not bar laws incentivizing certain market "structure[s]" where, as here, this favoritism does not effectively place a competitive disadvantage on out-of-state businesses. *Nat'l Pork Producers*, 143 S. Ct. at 1161 (plurality opinion) (quoting *Exxon*, 437 U.S. at 127); *see also Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 649 (6th Cir. 2010).

The lack of discriminatory effects also distinguishes the certificate-of-need decision on which Legacy relies: *Walgreen Co. v. Rullan*, 405 F.3d 50 (1st Cir. 2005). There, the First Circuit found unconstitutional Puerto Rico's certificate-of-need law for retail pharmacies. *Id.* at 60. Although this law applied neutrally on its face, Puerto Rico had enforced it in a way that favored local pharmacies. *Id.* at 55. A "grandfather clause" exempted existing pharmacies from the need requirement, and local entities owned 92% of these favored businesses. *Id.* at 55–56 (citation omitted). Moreover, existing pharmacies objected about twice as much to the proposed entry of foreign competitors as compared to local ones during the application process. *Id.* at 56. And only 58% of opposed outsiders received certificates of need as compared to 90% of opposed local applicants. *Id.* Legacy has shown nothing like these effects. *Cf. Colon Health Ctrs.*, 813 F.3d at 153–54. The company identifies no similar "grandfather clause." And no evidence suggests that in-state ambulance providers receive certificates of need more often than out-of-staters.

*Inquiry Three: Does Kentucky's law have a discriminatory purpose?* At times, we have suggested that a discriminatory purpose alone may invalidate a law that lacks discriminatory effects. *See LensCrafters*, 403 F.3d at 802–03. Yet the Supreme Court's precedent leaves unclear how this purpose inquiry fits into the mix. *See Foresight Coal Sales*, 60 F.4th at 296. The Court has noted that the Commerce Clause concerns itself with protectionist "effects, not motives," and thus does not require courts to investigate the subjective mindsets of the legislators who passed the law. *Id.* (quoting *Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015)). This disclaimer follows from the Court's longstanding caution against trying to deduce a single "intent" behind legislation enacted by a body of individuals. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1906 (2019) (plurality opinion); *Palmer v. Thompson*, 403 U.S. 217, 225 (1971).

As in *Foresight Coal Sales*, though, we need not resolve this debate about the proper role of legislative purpose. 60 F.4th at 296. Both the historical context and the plain text of Kentucky's certificate-of-need law show that its legislature did not enact it to harm out-of-state businesses. First the context: Kentucky's law dates to 1980, a time when certificate-of-need laws remained a "sensation" in the country. *Tiwari v. Friedlander*, 26 F.4th 355, 365 (6th Cir. 2022); 1980 Ky. Acts 360. In 1974, Congress even required States to enact these laws. *Tiwari*, 26 F.4th at 365. So Kentucky passed its law in part because this federal legislation made the law "a condition for the receipt of federal funds." 1980 Ky. Acts at 360. And while Congress rescinded the federal law in 1987, *see Tiwari*, 26 F.4th at 365, it is a stretch to claim that Kentucky had a hidden motive to harm out-of-state entities merely by attempting to comply with the then-existing federal mandates.

Next the text: The certificate-of-need law expressly identifies its "purposes." Ky. Rev. Stat. § 216B.010. And we generally find a law's text conclusive as to its objectives. *See Foresight Coal Sales*, 60 F.4th at 300. The law states that Kentucky sought to ensure that its citizens "have safe, adequate, and efficient medical care" and to minimize the "proliferation" of unneeded "health services" that "increases the cost of" care. Ky. Rev. Stat. § 216B.010. Kentucky thus sought to give its citizens high-quality, inexpensive care. Legacy cites nothing in the legislative record that would suggest Kentucky's legislature "really" sought to favor in-state businesses.

All told, Kentucky's certificate-of-need law does not facially discriminate against out-of-state ambulance providers. The law does not discriminate against them in its practical effect. And no evidence suggests that it stems from a discriminatory motive. So the law is not discriminatory.

B. *Does Kentucky's law survive* Pike *balancing?*

Because Kentucky's certificate-of-need law "regulates even-handedly" between in-state and out-of-state ambulance providers, we may enjoin the law only if Legacy shows that its burdens on interstate commerce "clearly" exceed its "local benefits" under the *Pike* balancing test. 397 U.S. at 142; *see LensCrafters*, 403 F.3d at 805. But just as a State faces a nearly

impossible task in proving the validity of a discriminatory law, so too a challenger faces a similarly tall order in proving the invalidity of a seemingly neutral law. *See Garber*, 888 F.3d at 843, 845. To put things in perspective, the Supreme Court "has not invalidated a law under *Pike*" in more than 30 years. *Id.* at 845; *see Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 891 (1988).

This cautious approach follows from the difficult nature of the task. An unconstrained balancing test asking judges to weigh a law's benefits against its costs requires them to make "subjective" policy "judgments" far outside their area of expertise in neutrally interpreting legal texts. *Garber*, 888 F.3d at 845. Because judges are generally not "economists or statisticians," we will have trouble assessing the validity of the empirical studies required for this balance even if experts can calculate the benefits and costs. *Colon Health Ctrs.*, 813 F.3d at 156. And often those calculations will be in the eye of the beholder. As one of many examples, the California law in *National Pork Producers* prohibited what many voters believed to be "cruel" methods of pork production. 143 S. Ct. at 1150–51 (citation omitted). How does one put a dollar value on a voter's moral distaste for animal cruelty so as to weigh the moral "benefits" from the law against the economic "costs" of its more expensive production methods? *See id.* at 1160 (opinion of Gorsuch, J.). There is a reason that one of Justice Scalia's better-known lines—that the weighing of incomparable interests is like judging "whether a particular line is longer than a particular rock is heavy"—arose in this *Pike* context. *Id.* (quoting *Bendix*, 486 U.S. at 897 (Scalia, J., concurring in the judgment)). These difficulties suggest that judges should hesitate to "second-guess" the "judgments of lawmakers concerning the utility of legislation." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) (citation omitted).

Perhaps for these reasons, the controlling plurality opinion in *National Pork Producers* recently imposed important constraints on the *Pike* inquiry. *See* 143 S. Ct. at 1161–64 (plurality opinion). The plurality held that courts should not even attempt to quantify a state law's local "benefits" or compare those benefits to the law's costs unless a challenger has first shown that the law inflicts "'substantial burdens' on interstate commerce[.]" *Id.* at 1161 (citation omitted). And the "costs" side of the *Pike* balance does not consider *all* burdens that a state law might impose; it considers only *interstate-commerce* burdens. *See id.* at 1161–63. This limit means

that the costs incurred by specific interstate *businesses*—in contrast to interstate *commerce* generally—do not matter. *Id.*; *see Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 451 (6th Cir. 2009). The California law in *National Pork Producers*, for example, would likely "shift market share" from out-of-state producers wedded to noncompliant production methods to other producers willing to change. 143 S. Ct. at 1162 (plurality opinion). But this effect on some businesses did not plausibly allege a substantial harm to interstate commerce. *Id.* Likewise, the "costs ultimately borne by in-state consumers" from a law that their legislature passed also fall outside *Pike*'s calculus. *Id.* Here again, the California law in *National Pork Producers* would raise the cost of pork production and so harm California consumers by making their pork more expensive. *Id.* But that price increase likewise did not show a substantial burden on interstate commerce. *Id.*

Legacy's case is on all fours with *National Pork Producers*. For three reasons, the company has not introduced enough evidence that Kentucky's certificate-of-need law places "'substantial burdens' on interstate commerce." *Id.* at 1161 (citation omitted). We thus need not attempt to measure the size of the law's benefits or balance those benefits against its burdens. *Id.*

*First*, Legacy has not gotten off to an "auspicious start" in proving a substantial burden because it has failed to establish that Kentucky's certificate-of-need law has discriminatory effects on out-of-state ambulance providers. *Id.* at 1159 (majority opinion). In that respect, Legacy is wrong to suggest that this lack of "discrimination" is "irrelevant" under *Pike*. Appellants' Br. 37. To the contrary, it goes a long way toward showing that Kentucky's certificate-of-need law passes muster. As the Court explained in *National Pork Producers*, the difference between the first and second steps of its Commerce Clause framework is a matter of degree, not of kind. 143 S. Ct. at 1157–59. Because both steps seek to implement the same "antidiscrimination rule" at the heart of the dormant Commerce Clause, *id.* at 1157, "no clear line" shows when a court's search for "discrimination" at step one should end and when its *Pike* balancing at step two should begin, *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 291 n.12 (1997). Even if a law lacks the stark effects that would render it presumptively invalid, *see Foresight Coal Sales*, 60 F.4th at 296–97, a court should still undertake *Pike* balancing with an eye toward the law's "practical effects" in search of a "discriminatory purpose," *Nat'l Pork Producers*,

143 S. Ct. at 1158. And while the Court has "left" open the possibility that a purely nondiscriminatory law might flunk *Pike* balancing on rare occasions, Legacy's challenge here "falls well outside *Pike*'s heartland." *Id.* at 1158–59.

*Second*, Legacy identifies two types of costs that Kentucky's certificate-of-need law imposes on out-of-state ambulance providers. The law entirely blocks ambulance providers who cannot obtain a certificate of need from selling their services to Kentuckians. Appellants' Br. 26. And even the providers who obtain certificates of need often must spend thousands of dollars and months of time in the application process. *Id.* Both arguments share the same defect. They might prove that the law imposes harms on "particular . . . firms" in interstate commerce, but they do not show substantial harm to interstate commerce generally. *Nat'l Pork Producers*, 143 S. Ct. at 1161 (plurality opinion) (quoting *Exxon*, 437 U.S. at 127).

As an initial matter, Kentucky's certificate-of-need law will cause consumers to "shift market share from" new entrants to incumbent ambulance providers. *Id.* at 1162. Yet this harm to new entrants alone does not establish any burdens on the interstate market. For all we know, the relative percentages of in-state and out-of-state applicants is the same as the relative percentages of in-state and out-of-state incumbents. Legacy's own expert also suggested that the total "volume" of market transactions might be "unaffected" by Kentucky's certificate-of-need law because the demand for health-care services is "relatively inelastic" (insensitive to price changes). Mitchell Rep., R.107-4, PageID 3494–95. So a shift from a free market to a regulated one might not change the proportions of interstate and intrastate commerce that make up the market. And the dormant Commerce Clause does not insulate a "particular" market "structure" from state legislation. *Nat'l Pork Producers*, 143 S. Ct. at 1162 (plurality opinion) (quoting *Exxon*, 437 U.S. at 127). "That goes" for ambulances "no less" than "pigs" or "gas stations." *Id.*

Besides, the effects that Legacy has identified here pale in comparison to those that the plurality found insufficient in *National Pork Producers*. There, the challengers alleged that California's law would increase the cost of pork production by 9.2% per pig. 143 S. Ct. at 1151; *id.* at 1170 (Roberts, C.J., concurring in part and dissenting in part). While Legacy cites an expert who testified that he had prepared certificate-of-need applications that cost between $7,000 and $50,000, *see* Sullivan Dep., R.107-4, PageID 3302, he was discussing all health-care

projects (not just ambulance services). And Legacy cites nothing to suggest that Kentucky's application process has increased the cost of ambulance trips by anything approaching 10% per trip.

In addition, as the dissent in *National Pork Producers* noted, the challengers in that case alleged that the California law had significant *national* effects. According to their complaint, the law would practically compel the entire pork industry to comply with California's restrictions because of that industry's "interconnected nature[.]" *Nat'l Pork Producers*, 143 S. Ct. at 1170–71 (Roberts, C.J., concurring in part and dissenting in part) (citation omitted). So even pork farmers with no interest in serving California's market would have to meet its requirements. *Id.* Legacy, by contrast, has not shown that Kentucky's certificate-of-need law has these sorts of "extraterritorial effects" on the national ambulance market. *Id.* at 1170; *cf. Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 451. The fact that Kentucky requires a certificate of need does not bar Legacy (or other providers) from competing freely in Ohio or any other State. If the allegations in *National Pork Producers* did not show a substantial burden, then, the evidence in this case cannot either.

*Third*, Legacy spends many pages describing the "human cost" of certificate-of-need laws like Kentucky's. Appellants' Br. 28–32. Kentucky's legislature suggested that, by restricting the supply of health care, its law would increase quality and decrease price. Ky. Rev. Stat. § 216B.010. But Legacy's expert explained that these laws have had the opposite effect. Under the standard economic model, this expert noted, a government-imposed limit on supply (like a cartel-imposed limit) will allow the quasi-monopolistic producers to raise their prices above competitive levels, reducing both the available services and consumer welfare. Mitchell Rep., R.107-4, PageID 3480–82. The expert added that the many empirical papers studying certificate-of-need laws show that the hypothesized effects have occurred in the real world. The laws "increase spending, limit access, and undermine the quality of care." *Id.*, PageID 3471. They also produce supra-competitive profits for incumbent providers (profits that the incumbents use to lobby the government to keep the protections) to the detriment of consumers and new entrants. *Id.*, PageID 3481, 3505.

The Cabinet disputes many of these findings because the health-care market (with its large Medicare and Medicaid payors) is far from the one studied by perfect-competition models. But we need not enter this debate for purposes of Legacy's constitutional challenge. Even accepting Legacy's version, the "human costs" that it bemoans are costs that Kentucky's legislature has inflicted on its own people. And "no one thinks that costs ultimately borne by in-state consumers thanks to a law they adopted count[] as a cognizable harm under" the dormant Commerce Clause. *Nat'l Pork Producers*, 143 S. Ct. at 1162 (plurality opinion). Kentuckians instead should seek to fix these in-state costs through the in-state "political process." *United Haulers*, 550 U.S. at 345; *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 200 (1994).

Since the days of Sir Edward Coke, many have suggested that government-procured monopolies violate the natural "liberty" of the people. 2 Edward Coke, *Institutes of the Laws of England* 47 (1642). Adam Smith, for example, described such monopolies as "nuisances in every respect" and "destructive to those which have the misfortunate to fall under their government." 2 Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 140 (Edwin Cannan, ed., 1904). Like Smith and many other classical economists since, Legacy may think that unfettered competition will produce the most efficient allocation of health-care resources for Kentuckians. But it must take this debate to Kentucky's legislature. The dormant Commerce Clause "does not require the States to subscribe to any particular economic theory." *CTS Corp.*, 481 U.S. at 92. And "[a] law can be both economic folly and constitutional." *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1132 (quoting *CTS*, 481 U.S. at 96–97 (Scalia, J., concurring)). As applied to intrastate ambulance trips, Kentucky's law "may well be folly; we are confident that it is constitutional." *Id.*

### III. Narrow "Interstate" Challenge

Legacy thus falls back on its narrow challenge to Kentucky's certificate-of-need law. Even if this law does not run afoul of the Commerce Clause for *intrastate* trips between two places in Kentucky, Legacy argues that the law violates the clause as applied to the *interstate* trips between Kentucky and Ohio that it also seeks to offer. According to Legacy, Kentucky's law "directly" obstructs this interstate commerce in violation of *Buck v. Kuykendall*, 267 U.S. 307 (1925). The district court rejected this claim on two grounds. The court found the law in

*Buck* distinguishable from Kentucky's "more carefully crafted" law. *Truesdell*, 626 F. Supp. 3d at 971. It next held that *Buck* had been "repudiated." *Id.* (citation omitted). We disagree on both fronts.

### A. *Is* Buck *distinguishable?*

We would not have to consider *Buck*'s current validity if we could distinguish the Washington law in that case from the Kentucky law in this one. But we find *Buck* directly on point. A.J. Buck wanted to provide a bus line from Seattle, Washington, to Portland, Oregon. *Buck*, 267 U.S. at 313. He obtained Oregon's permission for this interstate line without difficulty. *Id.* But a Washington law barred "common carriers" from selling transportation services to passengers unless they obtained a certificate from a state administrator finding that the "public convenience and necessity" warranted the additional services. *Id.* at 312–13. This administrator refused to grant Buck a certificate because he decided that competing companies "were already" offering "adequate" transportation options to interstate travelers. *Id.* at 313.

The Supreme Court held that Washington's certificate-of-public-necessity law violated the Commerce Clause as applied to Buck's proposed interstate bus line. *Id.* at 314–16. The Court recognized that Washington could adopt many regulations for interstate carriers, including those designed to promote public safety or maintain public roads, as long as these "safety" or "maintenance" regulations imposed only "indirect" and reasonable burdens on interstate commerce. *Id.* at 315. But Washington's law served no such purposes. Rather, Washington sought to exercise a veto power over interstate competition even though Oregon had granted Buck a license and found his new bus line warranted. *Id.* at 316. The Court held that the States lack the power to prohibit interstate "competition" in this way. *Id.* at 315. It reasoned that the federal government "peculiarly" maintained the authority to decide whether the existing "facilities for conducting interstate commerce" were adequate. *Id.* at 316. And the "commerce clause" barred state "regulation" of this "interstate commerce." *Id.*; *see also Sprout v. City of South Bend*, 277 U.S. 163, 169–71 (1928); *George W. Bush & Sons Co. v. Maloy*, 267 U.S. 317, 324–25 (1925).

*Buck* controls here.  Like Washington, Kentucky bars businesses that sell *interstate* transportation from offering their services unless they obtain a certificate of need from the Cabinet.  Ky. Rev. Stat. § 216B.061(1)(a).  And like Washington, Kentucky requires prospective suppliers to prove that a "need" exists for this interstate commerce.  900 Ky. Admin. Regs. 6:070 § 2(2).  The Cabinet's denial of a certificate to Legacy based on the lack of such a need also has the "effect" "not merely to burden, but to obstruct," that type of "commerce."  *Buck*, 267 U.S. at 316.  Yet the question whether there are "adequate facilities for conducting interstate commerce" belongs "peculiarly" to the federal government.  *Id.*  So Kentucky lacks the power "to prevent competition deemed undesirable."  *Bradley v. Pub. Util. Comm'n of Ohio*, 289 U.S. 92, 95 (1933).

The Cabinet responds that Kentucky's certificate-of-need law imposes a smaller burden on interstate commerce than the burden that the Washington law in *Buck* imposed.  According to the Cabinet, the Kentucky law does not require a certificate of need for Legacy to transport Kentucky residents or nonresidents from Ohio to Kentucky.  *See* 202 Ky. Admin. Regs. 7:501 § 6(2)(a).  The Cabinet also reads the law to permit Legacy to take Ohioans "from a Kentucky health care facility" "back to" Ohio without obtaining a certificate of need.  *Id.* § 6(2)(d).  The law thus bars Legacy only from transporting Kentuckians to Ohio venues.

We fail to see why the Cabinet's narrow reading of Kentucky's law saves it under *Buck*'s categorical logic.  The Court there held that the States may not prohibit interstate transportation services on the ground that other businesses are supplying an "adequate" amount of "interstate commerce."  267 U.S. at 316.  The Court did not say that a State could prohibit a "little" interstate transportation on this forbidden ground.  It said that the State could prohibit none at all.  Because Kentucky's "need" requirement would deny Legacy a certificate of need on the ground that *Buck* prohibited (that Legacy's "competition" is "undesirable" to the interstate market), the narrower nature of Kentucky's ban does nothing to distinguish *Buck*.  *Bradley*, 289 U.S. at 95.

The hearing officer's rationales for denying Legacy a certificate of need confirm that *Buck* applies.  In the hearing, Legacy predicted that it would provide 300 additional Kentucky runs each year.  This estimate was based on the number of times that Legacy had driven a patient from Ohio to Kentucky but been barred from taking the patient "back to Ohio" because of the

certificate-of-need law's application to those return trips.  Legacy Denial, R.107-12, PageID 4988.  The officer found a lack of "need" for Legacy to return its customers to Ohio because Legacy did not show that they had struggled to obtain "return transportation."  *Id.*  But this officer lacked the constitutional power to decide on "the existence of adequate facilities for conducting interstate commerce."  *Buck*, 267 U.S. at 316.  That decision is "peculiarly" for Congress.  *Id.*

Admittedly, interstate ambulance services do not resemble interstate busing services.  A State might well have greater concerns with ensuring the safety of potentially life-saving ambulance trips.  But *Buck* takes this factor into account.  That decision allows Kentucky to impose all manner of "safety" regulations on interstate carriers.  *Id.* at 315.  "Regulation to ensure safety is an exercise of the police power" as applied to both interstate and intrastate commerce.  *Bradley*, 289 U.S. at 95.  But the Cabinet does not defend Kentucky's "need" requirement on this basis.  In fact, other Kentucky regulations that Legacy does not challenge impose many safety requirements.  *See, e.g.*, 202 Ky. Admin. Regs. 7:550.  This case concerns only Kentucky's attempt to regulate interstate competition—something that the Cabinet may not do if *Buck* remains good law.

### B.  *Has* Buck *been repudiated?*

The Cabinet alternatively asks us to set *Buck* to the side on the ground that the Supreme Court's modern cases have repudiated it.  Yet even taking the Court's current precedent into account, we find ourselves bound by *Buck*.

1. To begin with, the Cabinet identifies no Supreme Court case that has expressly overruled (or even disapproved of) *Buck*.  To the contrary, the Court's modern cases repeatedly cite it.  Take *C & A Carbone*.  It analogized Clarkstown's flow-control ordinance to the Washington law in *Buck* when holding that the ordinance violated the Commerce Clause.  511 U.S. at 394.  The Court held that the ordinance regulated interstate commerce in "practical effect and design."  *Id.*  This fact rendered it invalid under *Buck*'s rule that States may not adopt a "prohibition" on interstate "competition."  *Id.* (quoting *Buck*, 267 U.S. at 315–16).

Or take *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978).  There, the Court found that the Commerce Clause rendered unconstitutional a New Jersey law that barred the import of garbage into an in-state landfill.  *See id.* at 623–29.  It cited *Buck* in support of the rule that "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected."  *Id.* at 624 (citing, among others, *Buck*, 267 U.S. at 315–16).

Lastly consider *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949).  The Court in that case found that a New York licensing regime for milk dealers violated the Commerce Clause.  *See id.* at 529–40, 545.  A state administrator had denied a license to a dealer who planned to ship milk to Boston because that export would divert supply from local New York markets.  *Id.* at 526–28.  The Court found this denial unconstitutional because the administrator had sought to restrict "the volume of interstate commerce" in order to subsidize "local economic interests[.]"  *Id.* at 530–31.  It relied on *Buck*'s rule that States may not prohibit interstate "competition."  *Id.* at 538.

Given this precedent, we and many courts have cited *Buck* as good law in decidedly "modern" Commerce Clause cases.  *See McNeilus*, 226 F.3d at 443; *see also NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 321 (5th Cir. 2022); *Walgreen*, 405 F.3d at 57; *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 395–99 (9th Cir. 1995).  Even the Washinton Supreme Court continues to believe that *Buck* bars it from applying the "state's certification" law "to a common carrier in exclusively interstate commerce."  *Port of Seattle v. Wash. Utils. & Transp. Comm'n*, 597 P.2d 383, 390 (Wash. 1979) (citing *Buck*, 267 U.S. at 316).  So if the Supreme Court has overruled *Buck*, nobody seems to have noticed.

2.  The Cabinet instead argues that we may disregard *Buck* because the Supreme Court no longer follows its *reasoning*.  Recall that *Buck* adopted a bright-line rule that States may not prohibit competition in an interstate market based on the conclusion that the existing supply suffices.  267 U.S. at 315–16.  The Cabinet suggests that this rule rested on outdated caselaw distinguishing between "direct" and "indirect" regulations of interstate commerce.  *See Maharg, Inc. v. Van Wert Solid Waste Mgmt. Dist.*, 249 F.3d 544, 549 (6th Cir. 2001).  According to the Cabinet, the Supreme Court has "repudiated" this direct-vs.-indirect distinction and now applies

its modern two-step test in all contexts. *Id.* Because we have found that Kentucky's certificate-of-need law does not discriminate against out-of-state ambulance providers or flunk the *Pike* balancing test, the Cabinet concludes, we may uphold that law in this interstate context too.

The Cabinet correctly notes that the Supreme Court has jettisoned the direct-vs.-indirect divide in other contexts. *Cf. Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 377–78 (6th Cir. 2013) (Sutton, J., concurring). The Court, for example, once used that distinction to evaluate laws regulating energy sales. *See Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 87–90 (1927). It permitted States to regulate *retail* energy sales to end users because this "local" regulation burdened interstate commerce "indirectly[.]" *Id.* at 87 (citation omitted). But it barred States from regulating *wholesale* energy sales to distributors because this "national" regulation placed a "direct burden" on interstate commerce. *Id.* at 88 (citation omitted); *see Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377–78 (1983). Eventually, the Court abandoned this "bright-line" wholesale/retail divide. *Gen. Motors Corp.*, 519 U.S. at 291 n.8. It found the "mechanical" rule inconsistent with its more flexible analysis in later cases. *Ark. Elec. Coop. Corp.*, 461 U.S. at 390–91. The Court now applies its "ordinary" two-step test under the negative Commerce Clause to all energy regulations. *Gen. Motors Corp.*, 519 U.S. at 291 n.8.

Similarly, the Court once adopted the direct-vs.-indirect divide in the tax context. It barred States from imposing a "direct" tax (but not an "indirect" one) on interstate commerce. *See Wynne*, 575 U.S. at 552; *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180–83 (1995). Under this divide, the Court treated taxes on "the privilege of doing interstate business" or on "interstate sales" as impermissible direct taxes. *See Spector Motor Serv. v. O'Connor*, 340 U.S. 602, 609 (1951); *Freeman v. Hewit*, 329 U.S. 249, 255–56 (1946). But it treated many others, such as taxes on net income, as indirect taxes. *See Wynne*, 575 U.S. at 552. The Court later overruled this formalistic approach tied to the type of tax because it ignored the "economic realities" of taxation. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 288 (1977). The Court switched to a test that looks to a tax's "practical effect," asking such questions as whether the tax is "fairly apportioned" to a company's in-state business and whether it "discriminate[s]

against interstate commerce[.]"   *Id.* at 279; *see also Wynne*, 575 U.S. at 552–53; *Maharg*, 249 F.3d at 549–50.

How should this precedent apply to *Buck*'s reasoning?  The answer is unclear.  On the one hand, we see two reasons why the caselaw might call *Buck* into doubt.  As an initial matter, both sets of cases shed rules that drew a "mechanical line" between laws that imposed direct burdens on interstate commerce (such as interstate sales taxes or regulations of wholesale energy) and those that imposed indirect burdens on that commerce (such as net income taxes or regulations of retail energy).  *Ark. Elec. Coop. Corp.*, 461 U.S. at 390.  And one could view *Buck* as adopting a similar "mechanical" rule: States *categorically* may not bar a new entrant from supplying interstate transportation on the ground that an adequate supply exists.  267 U.S. at 316.  *Buck* viewed such an anticompetitive law, without more, as a direct "regulation" "of interstate commerce."  *Id.*

In addition, the Court's modern Commerce Clause cases treat as presumptively invalid only laws that *discriminate* against out-of-state entities to favor in-state ones.  Yet *Buck*'s bright-line test does not turn on a finding that the Washington law discriminated against out-of-state bus lines in favor of in-state lines.  Buck himself was a "citizen of Washington," so the law in his own case had injured in-state interests.  *Id.* at 313.

On the other hand, two competing factors might suggest *Buck*'s continued vitality.  For one thing, *Buck*'s bright-line rule does not adopt a "formalistic" distinction that categorically bars States from regulating interstate carriers but categorically permits them to regulate intrastate ones.  *Ark. Elec. Coop. Corp.*, 461 U.S. at 390–91.  Rather, *Buck* recognized that States may impose many regulations on interstate and intrastate carriers alike, including those designed to ensure the "safety" of public roads.  267 U.S. at 315.  So a later case applying *Buck* upheld a State's refusal to grant a license to an interstate carrier when the State found the denial "necessary to promote the public safety."  *Bradley*, 289 U.S. at 96.  *Buck* has a much narrower scope: It bars States only from prohibiting new interstate carriers in order to protect the existing carriers from that increased "competition."  *Buck*, 267 U.S. at 315.  This safety-vs.-competition divide—one that turns on the reason behind a State's refusal to grant a license—does not resemble the "formalism over substance" that was the hallmark of the older cases in the energy

and taxation contexts.  *Complete Auto Transit*, 430 U.S. at 281.  *Buck*'s distinction instead turns on substance.

At its core, moreover, the Commerce Clause was designed to stop the "economic protectionism" that had spread among the States at the time of the founding.  *City of Philadelphia*, 437 U.S. at 623–24; *see Tenn. Wine & Spirits*, 139 S. Ct. at 2460.  And a State's denial of a certificate to engage in interstate transportation because of "the existence of adequate" interstate transportation options is a form of protectionism for incumbent providers at the expense of new entrants.  *Buck*, 267 U.S. at 316.  Perhaps stricter rules should apply when States regulate *interstate* commerce itself, even if States may engage in incumbent protection for *local* commerce when they do not discriminate in favor of in-state providers.  After all, the modern antidiscrimination rule was a byproduct of the Court's expansion of the Commerce Clause to cover local activities that substantially affected interstate commerce.  *See Am. Beverage Ass'n*, 735 F.3d at 377–78 (Sutton, J., concurring); *see also United States v. Lopez*, 514 U.S. 549, 558–59 (1995).  The States had long regulated these local activities.  So an absolute prohibition on state oversight of the activities under the guise of the dormant Commerce Clause would have enacted a sea change to our federalist structure.  An antidiscrimination rule, by contrast, leaves room for state regulation of intrastate activities that Congress may now reach with its own commerce power.

But when a State imposes a direct ban on competition in the "interstate transportation" market, it enters a field long subject to the federal government's oversight.  *Nat'l Pork Producers*, 143 S. Ct. at 1158 n.2; *see Lopez*, 514 U.S. at 558–59.  The Court's modern cases might still suggest that States cannot do so at all when regulating interstate (rather than local) commerce.  These cases note that the Court will enjoin a law *not just* if it promotes "in-state economic interests over out-of-state interests" *but also* if it "directly regulates or discriminates against interstate commerce" itself.  *Tenn. Wine & Spirits*, 139 S. Ct. at 2471 (citation and emphases omitted).  Many courts thus continue to suggest that "a state may not require a certificate of convenience and necessity from a carrier engaged exclusively in interstate commerce before it can operate within the state's borders."  *Medigen of Ky., Inc. v. Pub. Serv.*

*Comm'n of W. Va.*, 787 F. Supp. 590, 598 (S.D. W. Va. 1991) (collecting cases), *aff'd* 985 F.2d 164 (4th Cir. 1993).

In the end, we need not resolve this debate about whether *Buck* comports with the Supreme Court's modern cases. The Court has repeatedly reminded lower courts that we must apply one of its cases that is directly on point even if the logic of its later decisions has undercut the case. *See Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Hohn v. United States*, 524 U.S. 236, 252–53 (1998); *Agostini v. Felton*, 521 U.S. 203, 237–38 (1997); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Indeed, the Court has summarily reversed a court that jumped ahead of it by finding that the logic of a later decision had impliedly overruled the holding of an earlier one. *See Bosse*, 580 U.S. at 3.

This instruction applies here. Whether or not the Court's later cases disavowing the direct-vs.-indirect distinction call *Buck* into question, our marching orders are clear. We must continue to follow *Buck* as long as it "directly controls" our case. *Rodriguez de Quijas*, 490 U.S. at 484. For the reasons that we have explained, *Buck*'s holding applies with full force to the interstate transportation that Legacy seeks to provide. Kentucky's certificate-of-need law would bar Legacy from engaging in interstate commerce from Kentucky to Ohio on the ground that Kentucky "deem[s]" that increased interstate "competition" "undesirable." *Bradley*, 289 U.S. at 95. *Buck* prohibits a law that serves such an anticompetitive purpose. *Id.* So *Buck* binds us.

\* \* \*

We affirm in part and reverse in part. We affirm the district court's grant of summary judgment to the Cabinet with respect to Legacy's request to provide intrastate ambulance services. But we reverse its grant of summary judgment to the Cabinet with respect to Legacy's request to provide interstate ambulance services and remand for proceedings consistent with this opinion.